*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| WALKER E., | ) |
| | ) Supreme Court No. S-17778 |
| Appellant, | ) |
| | ) Superior Court Nos. 3PA-18-00138/ |
| v. | ) 00139/00140/00141/00142 CN |
| | ) |
| STATE OF ALASKA, | ) O P I N I O N |
| DEPARTMENT OF HEALTH & | ) |
| SOCIAL SERVICES, OFFICE OF | ) No. 7503 – February 12, 2021 |
| CHILDREN'S SERVICES, | ) |
| | ) |
| Appellee. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, John C. Cagle, Judge.

Appearances: Olena Kalytiak Davis, Anchorage, for Appellant. Mary Ann Lindquist, Senior Assistant Attorney General, Fairbanks, and Clyde "Ed" Sniffen, Jr., Acting Attorney General, Juneau, for Appellee. Rachel Levitt, Assistant Public Advocate, and James Stinson, Advocate, Anchorage, for Guardian Ad Litem.

Before: Bolger, Chief Justice, Winfree, and Maassen, Justices. [Carney and Borghesan, Justices, not participating.]

BOLGER, Chief Justice.

I.     INTRODUCTION

A father appeals the superior court's termination of parental rights to his five Indian children. He argues the court violated the Indian Child Welfare Act (ICWA)

by erroneously finding that the Office of Children's Services (OCS) made active efforts to reunify his family and that returning the children to his custody would likely seriously harm them. He argues OCS's proffered expert witness was not qualified under ICWA. Finally, he argues the court erred by determining termination of his rights to be in the children's best interests without discussing their Native heritage or mother's recent death, although these factors are mentioned nowhere in the relevant statute. As the superior court's findings satisfy statutory requirements, we affirm its termination of parental rights.

## II.     FACTS AND PROCEEDINGS

Walker E. and Astrid S. had five children together: Bernadette (now 12), Walker Jr. (now 11), Boris (now 7), Jaimie (now 4), and Anton (now 3).[1] Walker is affiliated with the Muscogee Creek Nation, and Astrid — who died in 2019 — was affiliated with the Knik Tribe. The five siblings are Indian children as defined in ICWA.[2] Before moving to Alaska in 2014, the family had interactions with a protective services agency in Oklahoma following rumors of neglect and abuse. In Alaska, OCS became involved with the family in 2016 when Jaimie tested positive at birth for oxycodone, cannabinoids, and an opiate; after Walker successfully participated in a random urinalysis (UA) program, OCS closed the case.

### A.     OCS Took Custody Of Walker's Five Children Following A Hospital Visit Revealing Most Of Them Had MRSA Sores And Tested Positive For Methamphetamine.

In August 2018 Astrid brought baby Anton to a hospital seeking treatment for his infected sores. Hospital workers contacted OCS when they became concerned about Astrid's lack of attentiveness to her son. When the OCS caseworkers asked Astrid

---

[1]     We use pseudonyms for all family members.

[2]     25 U.S.C. § 1903(4) (2018).

about substance use, she began yelling at them and throwing objects, nearly hitting Anton with a baby bottle. A drug test indicated she had used methamphetamine, amphetamine, cannabis, benzodiazepine, and opiates within the previous two days.

Astrid told OCS the family had recently been evicted from their home in Wasilla due to noise complaints. She could not articulate a plan to care for Anton; she did not know how she would get Anton's medicine, take him to the hospital for continued daily treatments, or make sure he stayed clean without guaranteed access to water. At OCS's request, Astrid's mother met with Walker to pick up the four older children and bring them to OCS at the hospital.

Anton, at 14 months, had a fever, lice, serious but healing burns, and severe sores from Methicillin-Resistant Staphylococcus Aureus (MRSA), a highly infectious, drug-resistant staph infection. Hospital staff reported that if Anton had been brought in one day later, the MRSA infection might have gone blood-borne and proved fatal. Even after being hospitalized for several days, Anton required daily hospital visits to treat his sores. Astrid had previously brought Anton into the hospital for the burns, sustained after Anton stumbled near a firepit. Astrid said she had recently taken Anton to Ptarmigan Pediatrics, but the doctor's office stated that Anton had not been seen in over a year.

Three of the children (Anton included) had MRSA sores and abscesses; Walker Jr. had one particularly serious sore the size of "half of . . . a tennis ball." The hospital had previously prescribed medication for the children's sores, initially diagnosed as insect bites, but the parents apparently lost the antibiotic medication and did not administer it as prescribed.

All five children had a variety of other medical and hygiene issues. Their vaccinations were not up-to-date. Two had lice. They were covered in dirt and "left

trails of dirt where they walked." Boris and Jaimie lacked socks, and one of Boris's feet was caked with up to half-an-inch of "mud almost formed like a cast on his foot."

Three of the children tested positive for drugs: Jaimie for methamphetamine, Boris for cannabis (THC) and methamphetamine, and Walker Jr. for methamphetamine. The eldest daughter, Bernadette, told OCS caseworkers she had seen her parents smoking a substance in a pipe with a harsh odor that burned her nose, typical of methamphetamine use. Bernadette had also found needles in the family's house, including in one of the children's rooms.

Domestic violence was also a concern. Bernadette told OCS caseworkers she had repeatedly heard her parents screaming and hitting each other, and once saw Walker choking Astrid. During these incidents Bernadette and Walker Jr. tried to care for the younger children and keep them unaware of the violence. Both parents admitted to arguments escalating beyond words — Walker said Astrid hit him, and Astrid said Walker had destroyed her phone.

OCS filed an emergency petition asserting the children were in need of aid under AS 47.10.011 (4) (medical neglect), (6) (substantial physical harm), (9) (neglect), and (10) (substance abuse). In August 2018, OCS took the children into custody. The agency was unable to place all five children in one home, and initially "went through a number of foster parents back to back due to the children's high needs and medical needs." OCS was later able to reunite the siblings in one placement, although it was not ICWA-preferred, and their living situation stabilized.[3]

---

[3] However, the permanent placement options under consideration would be ICWA-preferred. After initially determining that the children's grandmother would not be a suitable placement option, OCS later discussed the possibility with her on several occasions and she officially requested placement shortly before the termination trial. Walker's cousins in Oklahoma also expressed interest in the children and were working

(continued...)

**B.     OCS Referred Walker To Many Services, But He Failed To Engage With Them.**

OCS suspended parental visitation with the children early in the case due to health concerns. After Walker and Astrid first visited the children in September 2018, the children had another outbreak of MRSA and lice. When a second visit was again followed by an infection, OCS suspended visitation until the parents could be cleared for MRSA. Visits resumed when the hospital eventually confirmed negative MRSA tests, but the break in visitation lasted three months.

The family's first OCS caseworker drew up a case plan for Walker which he signed in November 2018. Walker's goals were identified as being "a safe and sober caregiver" who maintains a sober environment for his children, "acknowledg[ing] his history of domestic violence and the impact it has on his children," "understand[ing] the importance of maintaining a parent-child bond w[ith] his children," and maintaining appropriate behavior when interacting with them. Prescribed activities included completing a substance abuse assessment and following its recommendations, participating in a random UA program, attending a domestic violence intervention program, engaging with a parent navigator to learn parenting skills, and maintaining consistent contact with his children through visits and calls. To support these activities, the OCS caseworker referred Walker to visitation services and a domestic violence intervention program at Alaska Family Services, a substance abuse assessment at Set Free, a UA program at Valley Phlebotomy, and a parent navigator at Alaska Youth & Family Network.

In early January 2019 OCS, Walker, and the children's guardian ad litem all agreed to court orders determining the five children were in need of aid under

---

[3]     (...continued)
towards placement at the time of the trial.

AS 47.10.011 (10) (substance abuse) and placing them in temporary OCS custody. OCS stipulated that it had not made active efforts to reunify the family from September 4, 2018, to October 30, 2018.

In the spring of 2019, Aaron Edwards became the family's new OCS caseworker and evaluated Walker's case plan. He reported that Walker had made efforts to maintain a parent-child bond, having "participated in some supervised visits," although not consistently or recently. But Edwards also reported that Walker had not progressed in his sobriety or domestic violence goals; he had not completed a substance abuse assessment, participated in random UAs, or attended a domestic violence intervention program. As Astrid had made similarly limited progress, out-of-home placement continued.

Edwards remained in contact with Walker via cell phone, either calling or texting him. Although Walker did not own a cell phone until November 2018 he was periodically able to use Astrid's. Walker requested that Edwards communicate with him using Facebook Messenger, which he could access without phone service, but OCS policy did not allow Edwards to use Facebook Messenger. When Walker did not respond to texts or calls, Edwards would try to contact him through Astrid or her mother, whom Walker had designated to receive messages for him. Edwards also unsuccessfully attempted to contact the parents via the Knik Tribe; he did occasionally succeed in meeting with Walker after his visits with the children.

Edwards offered Walker taxi vouchers to help him access services, but Walker refused them. Walker testified that he had his own car, but that it broke down soon after OCS took custody of the children, so he relied on rides from friends or Astrid's mother. Edwards also offered him bus passes, which he declined because he was not living near any bus stops; instead Walker asked for gas cards, which OCS does not provide.

OCS communicated with the Knik Tribe about the family's needs for cell phone and transportation access. The Tribe's ICWA representative reached out to Walker via phone and Facebook Messenger, offering to help pay for cell phones and provide gas cards, but received no response.

Edwards referred Walker to parenting classes and set up new referrals for UAs, substance assessments, and a domestic violence intervention program. He provided the parents with call-in numbers, offered to sit down with them to call the service providers, and "then just encouraged [the parents] throughout the case to . . . continue making progress in making those phone calls, or setting those appointments, or participating in UAs." Walker told Edwards he planned to participate in the parent navigator program but that he was "not ready yet" or "not able right now to do it." Despite referrals from Edwards, Walker never attended parenting classes, a substance abuse assessment, or the family violence intervention program.

Walker told Edwards he was not able to enter Valley Phlebotomy for UAs because he did not have an identification card. Edwards said he took a picture of Walker and sent it to Valley Phlebotomy to serve as identification. Edwards texted call-in numbers for Valley Phlebotomy to Walker and Astrid and physically handed them sticky notes with the numbers; they told him they would do the testing.

Walker and Astrid missed most of their UA appointments. Walker was a no-show for at least 28 UA tests between September 2018 and November 2019. The two drug tests Walker did take were positive for controlled substances: a September 2018 hair follicle test was positive for methamphetamine and a December 2018 UA test was positive for marijuana, amphetamine, methamphetamine, and two opiates. Additionally,

Edwards sometimes smelled marijuana on Astrid and Walker when they visited the children.

OCS also provided services to the children. Edwards visited them monthly and referred the older three to Full Circle Counseling; by the time Edwards left the case, Boris was attending counseling regularly, often driven by Edwards to and from the appointments. Walker Jr. and Boris received dental care, and Anton underwent surgery for recurring infections from his pre-removal circumcision.

Visitation with the children was the one part of the case plan in which Walker meaningfully engaged and was generally "able to demonstrate goals set," although he still missed the majority of his scheduled visits. Astrid and Walker visited the children both jointly and separately, but their arguments sometimes upset the children. When Walker and Astrid reconciled after a brief separation, their joint visits yielded mostly positive interactions. In June 2019 Walker's visits were temporarily cancelled after he missed four appointments in a row. After Walker met with Edwards he reinitiated visits, but overall both parents were inconsistent at visitation.

Edwards completed another evaluation in October 2019, again noting that Walker's only engagement with his case plan was visitation. He again found that Walker had "not demonstrated the ability to keep his children safe, through changed behaviors." Edwards reached the same conclusion with respect to Astrid, and so OCS petitioned to terminate Walker's and Astrid's parental rights.

Astrid died in November 2019. After Walker became a suspect in the ensuing murder investigation, Alaska Family Services refused to continue hosting his visits with the children due to safety concerns. OCS attempted to arrange visits at its offices but was unable to contact Walker, as the FBI had seized his phone as part of the investigation. Walker's visits were consequently suspended for around three weeks. Visitation resumed in late November, again with largely positive results. This marked

the second time Walker's visits with his children were suspended during Edward's tenure on the case.

At the end of January 2020, less than a month before the termination trial, OCS reassigned the case to caseworker Sierra Hamilton. Walker came to Hamilton's office while she was out and left a note with his most recent phone number. Using that number, Hamilton called to invite Walker to a team decision meeting to discuss the children's placement, but the call did not go through. Hamilton first met with Walker the day before trial.

**C.  After A Three-Day Trial Including Expert Testimony, The Superior Court Terminated Walker's Parental Rights.**

The superior court held a three-day parental rights termination trial in February 2020. Walker took the witness stand to contest the termination of his parental rights. He said, "I realize now it's time to buckle down or it's . . . all that for nothing," and admitted that, if the children were returned to him, he would "probably have to just depend on, you know, [Astrid's mother] or somebody like that to help me be able to" take care of them, "because on my own, I can't take care of five children and continue a job."

OCS presented Karen Morrison as an expert witness. Morrison held bachelor's and master's degrees in social work and an Alaskan license for master's level social work. She had 17 years of experience with OCS working on cases involving ICWA families, the last three as supervisor of the Alaska Native Family Services unit in Anchorage, a position which involved participating in monthly Regional Tribal-State meetings and contributing to ICWA trainings. Morrison testified that she attended "a lot" of ICWA trainings required for license renewal and in her role at OCS; these included trainings "specific to Alaska Native families and culture" as well as "substance abuse issues" and ways "to determine . . . what the safety concerns are when parents are

abusing substances." Morrison had previously been qualified as an expert in ICWA and in other parental rights termination hearings in Alaska.

OCS moved to qualify Morrison as an expert under ICWA's heightened standard, which requires a witness other than the regular case worker, possessing "expertise beyond the normal social worker qualifications."[4] The agency explained that she would "testify regarding whether continued custody of the child by [Walker] is likely to result in serious emotional or physical damage to the child." After confirming with Walker that he had no objection, the court recognized Morrison "as an expert as proffered."

Morrison testified that if the children were returned to Walker's care, "they would likely suffer serious physical or emotional harm."[5] She pointed to Walker's failure to engage in substance abuse treatment and his continued use of substances including methamphetamine. She noted that the children's removal had been necessitated by domestic violence concerns as well as neglect stemming from the parents' substance abuse. Of particular concern to Morrison was the parents' medical neglect: their failures to effectively treat Anton's MRSA, lice, and burns and the infected sores on the other children.

Finally, Morrison predicted that Walker "would continue to use substances" and not prioritize his children's needs. Since Walker had failed to "[make] the behavior

---

[4]    *Marcia V. v. State, Office of Children's Servs.*, 201 P.3d 496, 504 (Alaska 2009) (quoting H.R.Rep. No. 95–1386, at 22 (1978), as reprinted in 1978 U.S.C.C.A.N. 7530, 7545).

[5]    Morrison's testimony was based on her review of the emergency petition, case notes, medical records, Alaska OCS records and reports, the guardian ad litem's disposition report, and records from the Oklahoma Department of Public Safety.

change needed to ensure that the children are safe," she opined, the neglect would likely continue if the children were returned to his care.

After considering the record and witness testimony, the court concluded OCS had met its duty under ICWA to make active efforts to reunify Walker with his children. The court acknowledged that OCS "fell short in the beginning months" of the case, but weighed its efforts "*as a whole.*" (Emphasis in original). It found OCS's suspension of visitation while Walker was under investigation for Astrid's murder "reasonable given the circumstances." The court emphasized that Walker "made only minimum effort to engage" in the many services offered by OCS and failed to "meaningfully engage" with the "issues that caused concern for his parenting."

The superior court concluded OCS had proved "beyond a reasonable doubt . . . that continued custody" by Walker was "likely to result in serious emotional or physical damage" to the children. The court specified that its conclusion was supported by "credible testimony from qualified expert Karen Morrison." It emphasized Walker's failure to engage with his case plan and the absence of any indication he had "remedied the conduct that brought the children into custody." The superior court determined all five children to be in need of aid under AS 47.10.011 (1) (abandonment), (9) (neglect), and (10) (substance abuse).

Finally, the court determined termination of Walker's parental rights to be in the children's best interests. It reasoned that, given "the multiple prior family interventions" and Walker's "minimal engagement" with his case plan, there was a high likelihood that his harmful conduct would continue if the children were returned to him. Accordingly, the superior court ordered Walker's parental rights to his five children terminated. Walker appeals.

## III. STANDARD OF REVIEW

Whether OCS made the "active efforts" at reunification required by ICWA "is a mixed question of law and fact."[6] We review the superior court's factual findings, including whether termination of parental rights is in the children's best interests, for clear error.[7] But we apply our independent judgment to questions of law, including whether the court's factual findings satisfy ICWA's "active efforts" requirement.[8]

"Whether returning a child to the parent would likely cause harm is a question of fact" reviewed for clear error.[9] "[W]hether the superior court's findings and the expert testimony presented at trial satisfy the requirements of ICWA" is a legal question.[10] But when a party fails to contest a witness's qualifications at trial, we review the trial court's determination a witness was ICWA-qualified for plain error.[11] Plain error exists "where an obvious mistake has been made which creates a high likelihood that injustice has resulted."[12]

---

[6] *Eva H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 436 P.3d 1050, 1052 (Alaska 2019).

[7] *Id.*

[8] *Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 212 P.3d 756, 761 (Alaska 2009); *see* 25 U.S.C. § 1912(d) (requiring active efforts).

[9] *Jude M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 394 P.3d 543, 558 (Alaska 2017).

[10] *Eva H.*, 436 P.3d at 1052 (quoting *Bob S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 400 P.3d 99, 105 (Alaska 2017)).

[11] *See Marcia V. v. State, Office of Children's Servs.*, 201 P.3d 496, 504 (Alaska 2009).

[12] *Id.* at 502 (quoting *Miller v. Sears*, 636 P.2d 1183, 1189 (Alaska 1981).

## IV. DISCUSSION

### A. OCS Made Active Efforts To Reunify Walker With His Children.

Before a trial court terminates parental rights to an Indian child, ICWA requires it find by clear and convincing evidence that OCS made "active efforts . . . to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family."[13] Federal regulations define "active efforts" as "affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family."[14] The State must go beyond passively drawing up a case plan. To engage in "active efforts," an agency must help the parent "through the steps of [the] case plan and with accessing or developing the resources necessary to satisfy the case plan."[15]

Under our "case-by-case approach" to analyzing whether OCS made active efforts, we consider the agency's "involvement +in its entirety."[16] Its "efforts need not be perfect; they need only be reasonable under the circumstances."[17] And a court may

---

[13]     25 U.S.C. § 1912(d); CINA Rule 18(c)(2)(B); *see Demetria H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 433 P.3d 1064, 1070-71 (Alaska 2018).

[14]     *Demetria H.*, 433 P.3d at 1071 (quoting 25 C.F.R. § 23.2 (2016)).

[15]     *Id.*

[16]     *Dale H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.* 235 P.3d 203, 213 (Alaska 2010) (case-by-case approach); *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1268 (Alaska 2008) (entirety of involvement).

[17]     *Sylvia L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 343 P.3d 425, 432 (Alaska 2015).

consider "a parent's demonstrated lack of willingness to participate in treatment."[18]

Walker argues OCS failed to meet its obligation under ICWA to make active efforts to reunify him with his children. He claims "OCS merely . . . drew up a case plan and left [Walker] to satisfy it," failing to assist Walker in any way beyond making referrals. The substantive bulk of OCS's efforts to prevent the breakup of Walker's family did consist of drafting a case plan and then referring him to the services mentioned in the plan: a substance abuse assessment, random UAs, visitation services, a domestic violence intervention program, and parenting classes.

But in addition to making referrals and re-referrals, OCS caseworker Aaron Edwards consistently encouraged Walker to contact service providers, set up appointments, and participate in UAs. Edwards provided call-in numbers and offered to sit down with Walker and call those services. When Walker could not enter the UA facility because he lacked identification cards, Edwards sent a picture of Walker to serve as identification.

Despite these efforts by OCS, Walker engaged in virtually none of the services offered other than visitation. He participated in only one UA, which came back positive for amphetamine and opiates, and was a no-show for the rest. Walker never went to the substance abuse assessment and never participated in the parenting classes, domestic violence intervention program, or parent navigator services offered. The record thus supports the trial court's finding that Walker failed to meaningfully engage with the services provided.

Walker argues OCS failed to help him develop the resources necessary to succeed, pointing to transportation and communication barriers he faced. Walker

---

[18] *Maisy W.*, 175 P.3d at 1268 (quoting *N.A. v. State, DFYS*, 19 P.3d 597, 603 (Alaska 2001)).

testified that his car broke down soon after OCS took custody of his children and he did not have his own phone until three months before trial. Although Walker asked Edwards to communicate via Facebook Messenger, OCS policy did not allow Edwards to do so.

But OCS did make efforts to remedy these barriers. Edwards offered Walker either taxi vouchers or bus passes, which Walker declined. Edwards communicated with the Knik Tribe about Walker's needs for consistent cell phone and transportation access. The Tribe reached out to Walker offering to help pay for cell phone service and provide gas cards but received no response. Through considerable effort, OCS also generally maintained contact with Walker. Edwards called and texted the numbers Walker provided, which worked often enough to enable monthly text or phone conversations, and he left messages with Astrid's mother, whom Walker had designated to pass messages to him. Edwards also tried speaking to Walker when he came to visit the children and contacting him via the Knik Tribe.

Given Walker's demonstrated "lack of willingness to participate in treatment,"[19] OCS's efforts to guide Walker through his case plan, connecting him to a wide range of services and offering him transportation and communication resources, were "reasonable under the circumstances."[20] The superior court did not err by concluding that OCS engaged in active efforts to reunify Walker with his children.

Walker additionally claims that OCS actively "discouraged [him] from fully engaging" with his case plan by denying him visitation for extended periods of time — notably, during the first two months after removal and again after Astrid's death. Walker claims these interruptions in visitation, the one area where OCS acknowledged his

---

[19] *Id.* (quoting *N.A. v. State, DFYS*, 19 P.3d 597, 603 (Alaska 2001)).

[20] *Sylvia L.,* 343 P.3d at 432. In addition to OCS's efforts directed at Walker, Edwards also ensured the children received medical treatment and counseling, often personally driving one child to and from appointments.

progress and engagement, rendered the agency's efforts "fatally deficient." OCS admitted it failed to make active efforts toward reunification during September and October 2018, which overlapped with its suspension of Walker's visits with his children due to MRSA concerns. And OCS lapsed in its efforts for another month in late 2019, when it suspended visitation when Walker was a suspect in the murder investigation into Astrid's death. But we assess the State's "involvement in its entirety."[21]

Reviewing the record as a whole, we conclude OCS met its active efforts obligations. Periods of inadequate efforts by OCS lasting "for a matter of months" do not necessarily "render the entirety of the [S]tate's efforts inadequate."[22] And "[i]f a parent has a long history of refusing treatment and continues to refuse treatment, OCS is not required to keep up its active efforts once it is clear that these efforts would be futile."[23] By late 2019, Walker had developed just such a history, repeatedly refusing treatment for substance abuse, domestic violence, and parenting skills. As a result, OCS's temporary lapses did not render the rest of its efforts inadequate, and those efforts satisfied ICWA.

**B.      The Trial Court Did Not Err By Finding That Returning The Children To Walker's Custody Would Likely Result In Serous Harm To Them.**

In order to terminate parental rights, ICWA requires "a determination, supported by evidence beyond a reasonable doubt . . . that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical

---

[21]      *Maisy W.*, 175 P.3d at 1268.

[22]      *Philip J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 314 P.3d 518, 528 (Alaska 2013).

[23]      *Id.* (quoting *Wilson W. v. State, Office of Children's Servs.*, 185 P.3d 94, 101 (Alaska 2008)).

damage to the child."[24]  This determination must be supported by testimony of at least one qualified expert witness.[25]

Walker argues the trial court's determination that Walker's custody of the children would likely result in serious harm was deficient in two respects:  first, OCS's proffered expert witness was not qualified under ICWA; and second, OCS's evidence failed to establish the likelihood of this harm beyond a reasonable doubt.

### 1.	The trial court's qualification of OCS's expert witness under the heightened ICWA standard was not plain error.

ICWA heightens the requirements to qualify an expert witness.[26]  An expert "called to testify about issues that do not implicate different cultural norms need not have cultural expertise," but must be qualified to testify to the question of likelihood of harm to the child.[27]  The expert must not be the social worker regularly assigned to the case.[28]

---

[24]	25 U.S.C. § 1912(f); *see also* CINA Rule 18(c)(4).

[25]	*D.A.W. v. State*, 699 P.2d 340, 342 (Alaska 1985) (testimony of only one qualified witness required); *see also* 25 U.S.C. § 1912(f); CINA Rule 18(c)(4).

[26]	*Bob S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 400 P.3d 99, 105, 108 (Alaska 2017).

[27]	*Eva H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 436 P.3d 1050, 1054 (Alaska 2019); *see also L.G. v. State, Dep't of Health & Soc. Servs.*, 14 P.3d 946, 952-53 (Alaska 2000) (concluding "where there is clear evidence that a child faces a serious risk of physical neglect if she remains in her parent's care, a trial judge may terminate parental rights without hearing testimony from an expert in Native cultures"); 25 C.F.R. § 23.122(a) (2016) (the "witness *must* be qualified to testify regarding whether the child's continued custody by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child" and "*should* be qualified to testify as to the prevailing social and cultural standards of the Indian child's Tribe" (emphases added)).

[28]	25 C.F.R. § 23.122(c) (expert witness cannot be social worker regularly
(continued...)

And the expert must have education and training reflecting "expertise beyond the normal social worker qualifications."[29] Witnesses with "substantial education in social work or psychology and direct experience with counseling, therapy, or conducting psychological assessments" are clearly qualified under ICWA.[30] And we have recognized witnesses with "master's degrees in social work, internships in relevant subject areas as required for their degrees, agency training, and continuing professional education" as satisfying ICWA standards.[31]

Walker argues that the superior court committed plain error by qualifying Karen Morrison as an expert witness under ICWA. Walker claims Morrison's "lack of experience counseling and diagnosing children renders her unqualified to testify to the substantial harm element of ICWA." He contends we cannot infer Morrison had expertise beyond that of a "normal social worker."

Since Walker's counsel at trial voiced no objection to Morrison's qualification as an ICWA expert, a plain error standard of review applies.[32] Under this

---

[28] (...continued) assigned to child); *Eva H.*, 436 P.3d at 1054-55.

[29] *Eva H.*, 436 P.3d at 1054 (quoting U.S. DEP'T OF THE INTERIOR, GUIDELINES FOR IMPLEMENTING THE INDIAN CHILD WELFARE ACT 54 (2016)).

[30] *Id.* at 1057.

[31] *In the Matter of Candace A.*, 332 P.3d 578, 586 (Alaska 2014) (holding trial court erred by excluding witnesses' testimony); *see also Payton S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 349 P.3d 162, 171-72 (Alaska 2015) (qualified witness was OCS regional manager with "a master's degree in social work," who took continuing education courses and had performed psychological assessments at psychiatric institute).

[32] *Marcia V. v. State, Office of Children's Servs.*, 201 P.3d 496, 504 (Alaska (continued...)

standard, we have previously inferred "expertise beyond that of a normal social worker" from a witnesses's qualifications of "extensive OCS experience" and "master's-level licensure in social work."[33] In *Marcia V.*, we upheld the trial court's qualification of a witness under a plain error standard, even though the record "d[id] not unambiguously reflect a foundation" for the witness having "expertise beyond the normal social worker qualifications."[34] The witness had a bachelor's degree in justice administration.[35] She served as an OCS caseworker for three years, an OCS "team decision making facilitator" for a year, and an OCS supervisor for three years.[36] Her resume featured "thirteen trainings in various areas of child protection . . . including effects of abuse and neglect on children."[37] But "[b]ecause it was possible to infer from [the witness]'s known qualifications that she possessed the qualifications necessary under ICWA," we concluded that accepting her as an expert witness was not plain error.[38]

For the same reasons, the superior court here did not commit plain error by qualifying Morrison as an expert witness under ICWA's heightened standard.

---

[32]     (...continued)
2009).

[33]     *Eva H.*, 436 P.3d at 1057 (citing *Lucy J. v. State, Dep't of Health &Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1118-19 (Alaska 2010)*; Marcia V.*, 201 P.3d at 504-05).

[34]     *Marcia V.*, 201 P.3d at 505.

[35]     *Id*.

[36]     *Id.*

[37]     *Id.*

[38]     *Id.* ("The 'high likelihood of injustice' required to reverse under the plain error standard of review is not present here.").

Morrison's known qualifications match or exceed the qualifications of the *Marcia V.* witness. Morrison's long experience as a caseworker would naturally have involved assessing likelihood of harm. She held bachelor's and master's degrees in social work and an Alaska license for master's level social work — more specialized education than the witness in *Marcia V*[39] or the unqualified witness in *Eva H.*, who had "no formal training in social work, psychology, or counseling."[40] Morrison had 17 years of experience at OCS, including 3 years supervising the Alaska Native Family Services unit in Anchorage. Like the *Marcia V.* witness, Morrison had attended many ICWA trainings, which addressed "substance abuse issues" and how "to determine . . . what the safety concerns are when parents are abusing substances." Morrison's testimony established she had "substantial education in the area of [her] specialty" as well as "agency training[] and continuing professional education," supporting an inference that she had the qualifications required by ICWA.[41] We thus conclude that qualifying her as an expert witness under ICWA was not plain error.

### 2. Adequate evidence supported the court's finding of a likelihood of harm.

For a superior court to terminate parental rights, ICWA requires it to find beyond a reasonable doubt that returning the child to the parent "is likely to result in serious emotional or physical damage to the child."[42] Testimony from at least one expert

---

[39] *Marcia V.,* 201 P.3d at 505.

[40] *Eva H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 436 P.3d 1050, 1057 (Alaska 2019).

[41] *Id.* at 1055 (quoting *In the Matter of Candace A.*, 332 P.3d 578, 586 (Alaska 2014)).

[42] 25 U.S.C. § 1912(f); *see also* CINA Rule 18(c)(4).

witness must "constitute[] some of the evidence upon which the judge bases this finding."[43] But expert testimony "need [not] be the sole basis."[44]

Walker argues that OCS's evidence failed to meet the beyond a reasonable doubt threshold, emphasizing regulations issued by the Bureau of Indian Affairs.[45] According to these regulations, which we have previously applied, the State's "evidence must show a causal relationship between the particular conditions in the home and the likelihood" of serious harm to the child.[46] Without establishing this causal relationship, "evidence that shows only the existence of . . . [parental] substance abuse[] or nonconforming social behavior" will not "by itself" prove beyond a reasonable doubt that the likelihood required by ICWA exists.[47]

OCS's expert witness testified that if the children were returned to Walker's care, "they would likely suffer serious physical or emotional harm" because Walker "would continue to use substances" and not prioritize the children's needs. Morrison opined that, since Walker had failed to demonstrate any behavioral change in the areas of substance abuse or domestic violence, the same concerns that necessitated his children's removal would reoccur if they were returned to him. This expert testimony supports the superior court's conclusion.

---

[43] *Jude M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 394 P.3d 543, 558-59 (Alaska 2017) (quoting *Marcia V.*, 201 P.3d at 508).

[44] *Id.*

[45] 25 C.F.R. § 23.121 (2016).

[46] *Eva H. v. State, Dep't of Health & Soc. Servs, Office of Children's Servs*, 436 P.3d 1050, 1054 (Alaska 2019) (quoting 25 C.F.R. § 23.121(c)).

[47] *Id.* (quoting 25 C.F.R. § 23.121(d)).

And that testimony did not stand alone. Domestic violence, the parents' substance abuse, and neglect necessitated removal for the children's safety. Walker presented no evidence suggesting he had changed any of his unsafe behaviors since his children's removal,[48] while ample evidence suggested he had not. Walker admitted he would be unable to care for five children alone. The only two drug tests he took indicated amphetamine and opiate use. He failed to show up for any other scheduled drug tests, did not obtain a substance abuse assessment or follow a treatment plan, and did not attend parenting classes or a domestic violence intervention program. The trial court did not err in determining the evidence showed beyond a reasonable doubt that if Walker's children were returned to his custody they would likely suffer serious emotional or physical harm.

### C. The Court Did Not Err By Finding Termination Of Walker's Parental Rights To Be In The Children's Best Interests.

Lastly, Walker argues the trial court erred in concluding that termination of his parental rights was in the children's best interests. Walker claims the court's best interests determination was defective because it did not mention either the death of the children's mother or their Native heritage. He asserts that the court "fail[ed] to consider [the children's] interests in remaining connected to their Native father, their Native family, their Tribes, [and] their culture," contrary to the purpose of ICWA.

We have previously rejected the argument that the court determining a child's best interests must consider "the importance of having the child raised within the Indian child's community."[49] The ICWA preference for placements affiliated with the

---

[48] That Walker attended almost half of scheduled visits with his children is not relevant to safety concerns.

[49] *Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, (continued...)

child's tribe guides the selection between placement options; it does not affect the decision whether to terminate parental rights.[50]  A court facing this decision must find that termination is in the child's best interests, but the requirement comes from AS 47.10.088(c), not ICWA.

Alaska Statute 47.10.088(b) identifies five best interest factors, but the list is not exclusive and the court may "consider any fact relating to the best interest of the child."[51]  The superior court could have weighed Astrid's death or the children's heritage, but a court "need not accord a particular weight to any given factor," even those specified in the statute.[52]  The court therefore did not clearly err in citing the "the totality of the circumstances" in its determination that terminating parental rights was in the children's best interests.[53]  And the court did consider specific, statutorily enumerated factors.

The superior court explained that, given "the multiple prior family interventions" by state agencies and Walker's "minimal engagement" with his case plan, there was a high likelihood that Walker's harmful conduct would continue if the children were returned to him.  The court thus reasonably analyzed three factors enumerated in AS 47.10.088(b):  "the amount of effort by the parent to remedy the conduct or the

---

[49]     (...continued)
244 P.3d 1099, 1120 (Alaska 2010).

[50]     *Id.*

[51]     *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1263 (Alaska 2010) (quoting AS 47.10.088(b)).

[52]     *Id.*

[53]     *Eva H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 436 P.3d 1050, 1052 (Alaska 2019) (quoting *Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 254 P.3d 1095, 1103-04 (Alaska 2011)).

conditions in the home; . . . the likelihood that the harmful conduct will continue; and . . . the history of conduct by or conditions created by the parent." The superior court did not clearly err by concluding that termination of Walker's rights was in his children's best interests.

## V.    CONCLUSION

We AFFIRM the superior court's termination of Walker's parental rights.