NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

# THE SUPREME COURT OF THE STATE OF ALASKA

MILLIE T.,                                         )
                                                   )
            Appellant,         )
                                                   )
    v.                                             )
                                                   )
STATE OF ALASKA, DEPARTMENT                         )
OF FAMILY & COMMUNITY                               )
SERVICES, OFFICE OF CHILDREN'S                      )
SERVICES,                                          )
                                                   )
            Appellee.          )
                                                   )
                                                   )
FRANK L.,                                          )
                                                   )
            Appellant,         )
                                                   )
    v.                                             )
                                                   )
STATE OF ALASKA, DEPARTMENT                         )
OF FAMILY & COMMUNITY                               )
SERVICES, OFFICE OF CHILDREN'S                      )
SERVICES,                                          )
                                                   )
            Appellee.          )
                                                   )

Supreme Court Nos. S-19248/19258 (Consolidated)

Superior Court Nos. 3PA-21-00263/00265 CN (Consolidated)

MEMORANDUM OPINION AND JUDGMENT*

No. 2122 – December 17, 2025

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Kristen C. Stohler, Judge.

---

\*     Entered under Alaska Appellate Rule 214.

Appearances:  Katrina Larsen, Assistant Public Advocate, Juneau, and James Stinson, Public Advocate, Juneau, for Appellant Millie T.  Michael L. Horowitz, Law Office of Michael Horowitz, Kingsley, Michigan, for Appellant Frank L.  Kimberly D. Rodgers, Assistant Attorney General, Anchorage, and Treg Taylor, Attorney General, Juneau, for Appellee.

Before:  Carney, Chief Justice, and Borghesan, Henderson, Pate, and Oravec, Justices.

## I.    INTRODUCTION

A mother and a father appeal termination of their parental rights.  The mother urges reversal, arguing the superior court erred by finding that she failed to remedy within a reasonable time the conduct or conditions that placed her children in need of aid.  The father argues the court erred by finding that termination of his rights was in his child's best interests.  We conclude that the superior court did not clearly err with respect to either of these findings.  Accordingly, we affirm the termination order.

## II.    FACTS AND PROCEEDINGS

Millie T. is the mother of Ryker, Emmett, and Evan.[1]  Frank L. is the father of Evan.[2]  Around the time this case was initiated, Ryker, Emmett, and Evan — who were then fifteen, thirteen, and twelve, respectively — were living with Millie and Frank in Wasilla.

One evening in early November 2021, Emmett ran away from home and spent the night in an unlocked truck after being whipped by Frank.  Millie picked him up in the morning and brought him to the hospital.  Emmett was placed on a 24-hour

---

[1]    We use pseudonyms for all family members to protect their privacy.

[2]    Ryker's and Emmett's fathers were subject to separate petitions for termination of parental rights, which are not at issue in this appeal.

mental health hold, then released. That night Emmett had a violent meltdown, during which he threatened to kill other people in the home, tried to injure the family dog, and tried to stab himself. Millie restrained him with zip ties, and state troopers brought him back to the hospital.

During an interview with a worker from the Office of Children's Services (OCS) at the hospital, Emmett reported serious physical abuse from Frank and dangerous conditions in the home. He described how Frank had beaten him severely and enlisted him in dangerous activities. Emmett told OCS that Millie did not witness Frank's physical abuse toward him, but that he had described it to her. When Emmett described the abuse, Millie would normally tell him that if he had listened better, it would not have happened. Emmett also described physical abuse between Millie and Frank, including incidents when Frank injured Millie's arm badly enough to require medical treatment and when Millie hit Frank with a pipe because Frank was "putting hands" on Ryker.

Emmett's statements were largely corroborated by a subsequent OCS home inspection, statements from Millie, statements from Ryker, and a contemporaneous criminal investigation. OCS contacted Ryker and Evan at the home after obtaining a writ of assistance from law enforcement.[3] Millie confronted the OCS workers, yelled at them for trespassing, and called them names. Once in the home, OCS workers observed exposed electrical wires, excessive clutter (blocking all but one exit), inadequate heating, and a lack of food. They interviewed Ryker and Evan, who did not

---

[3] According to OCS, a writ of assistance was necessary because during previous child welfare investigations, Millie "was not very cooperative." Between 2007 and 2021, OCS investigated more than 20 reports of neglect, abuse, or mental injury to Ryker, Emmett, and Evan. Three were substantiated. The substantiation of these reports led to removals of the children twice: from 2009 into late 2010 and from 2013 to 2015.

report being physically abused. At trial, however, Ryker testified that Frank was violent, shoving and hitting the children and Millie.[4]

OCS took emergency custody of all three children due to concerns about neglect, domestic violence, and physical abuse. Ryker and Evan were initially placed in a non-relative foster home together, and Emmett was placed in residential mental health treatment. After a contested hearing, the superior court concluded in January 2022 that all three children were in need of aid, that it was contrary to their welfare to return home, and that OCS had made reasonable reunification efforts.

At one point after the children had been removed from their home for a few months, Ryker's foster mother became worried when he was not at their agreed-upon pickup location after hanging out with friends. Ryker's foster mother enlisted Millie and Frank to help find him. Millie and Frank, riding together in a car, found Ryker and pulled up alongside him. Frank then pointed a gun at Ryker's head and told him to get in the car or be shot.

OCS prepared case plans for both parents in February 2022, with requirements to complete domestic violence assessments, psychological evaluations, and any additional treatment recommended. Millie began completing the requirements of her case plan, and OCS arranged weekly supervised visitation with Ryker and Evan for Millie and Frank.[5] Millie remained fairly consistent with her visitation, but Frank stopped attending after a couple of months.

Millie completed a family violence assessment in April 2022, in which she consistently minimized the level of violence in the family. She told the evaluator

---

[4] Ryker testified that, during his initial interview, he was reluctant to describe the violence or living conditions in the home because he felt he needed to "cover" for Millie and Frank.

[5] Emmett remained in residential mental health treatment. By at least mid-2023, Millie was regularly engaging in visitation with Emmett and had flown out of state to visit him while he was in residential treatment in another state.

that Frank was not abusive or violent and stated that OCS was the source of the family's problems. When Millie was asked to identify adverse childhood experiences her children had endured, she did not mention any risk factors related to abuse or neglect. In a domestic violence danger assessment, she denied that Frank had physically abused the children. Based on the assessments, the evaluator concluded Millie used her anger to control others, could not take accountability for her actions, and was unable to appreciate her children's perspectives of the unhealthy family dynamic.

Millie also completed a psychological evaluation, during which the evaluator found that Millie's difficulty in managing her emotions and behaviors likely stemmed from an abusive childhood, but that Millie herself did not seem to be aware of how her childhood affected her emotional reactivity. Millie again denied any domestic violence in her relationship with Frank. The evaluator recommended that Millie undertake cognitive behavioral therapy and additional classes on adverse childhood experiences and domestic violence.

Millie engaged with cognitive behavioral therapy in March 2023, but her efforts were inconsistent and sporadic. Initially, Millie's therapist noted that Millie did "not feel she need[ed] to do any more mental health or treatment services." But the therapist reported some positive changes over the eight months Millie was engaged with therapy, including that her relationship with Frank had allegedly ended[6] and that she was coming to understand she had failed to protect her children from Frank's abuse.

By September 2023 Millie had completed the majority of the activities in her case plan. When OCS followed up with Millie's providers, however, OCS remained

---

[6] Millie and Frank gave conflicting information about why they had allegedly ended their relationship in April or May of 2023. Millie told her therapist that she had realized that Frank was abusive and aggressive. But Millie told OCS it was because Frank did not love her anymore and she wanted to focus on her children. And Frank told OCS it was because Millie had anger issues and implied that she told OCS they broke up just so that OCS would return the children.

concerned that her relationship with Frank had not truly ended. OCS's suspicions were based on a sighting of the couple together at a gas station and Frank's admissions that he was still "talking and associating" with Millie. The children's guardian ad litem also remained concerned that Millie continued to demonstrate many of the same problematic thought patterns despite cognitive behavioral therapy.

Meanwhile, Frank made limited progress on his case plan. He completed a parenting class in March 2022. After that, however, Frank had only minimal engagement with OCS. In September 2023 he reported to OCS that he would be out of the area for work and did not make any more progress on his case plan.[7] OCS reported only four or five contacts with Frank over the entire duration of the case.

During the three years the case was open, Ryker and Evan generally continued to engage in supervised visitation with Millie, although they occasionally declined to attend, left early, or had visits cut short by supervisors because of conflict with Millie or each other. Visitation supervisors reported that Millie appropriately addressed some conflicts between the children, but that she continued to tell her children that OCS was responsible for their removal and, when criticized, told visitation supervisors she "would decide how to parent." Following their placement into separate foster homes, both Ryker and Evan reported doing well, and both ultimately expressed a desire not to return to their parents' custody.

The superior court held a four-day termination trial in April 2024. Following trial, the court found that all three children were in need of aid under AS 47.10.011(6) (substantial physical harm or substantial risk thereof), (8) (mental injury or substantial risk thereof), and (9) (neglect). The court found that both parents

---

[7] Frank subsequently had two brief phone calls with OCS in 2024. In January he told OCS he had been in contact with Millie "the whole time." In February, after Frank said that he would like visitation with Evan, OCS arranged a renewed referral for supervised visitation, but Frank did not reengage with visitation.

had failed to remedy the conditions that placed their children in need of aid, and that the State had made reasonable efforts toward reunification. The court found that termination was in Ryker's and Evan's best interests and terminated both parents' rights to Evan and Millie's rights to Ryker. However, the court found that termination was not in Emmett's best interests and refused to terminate Millie's parental rights to Emmett.[8]

Millie and Frank appeal.

## III. STANDARD OF REVIEW

"[W]e review a trial court's factual findings for clear error and questions of law de novo."[9] " 'Whether the parent has remedied the conduct [causing a child to be in need of aid] is a factual determination best made by a trial court,' and therefore we review this question for clear error."[10] Whether termination is in a child's best interests is also a factual finding reviewed for clear error.[11] "We will conclude that '[f]actual findings are clearly erroneous if review of the entire record leaves us with a definite and firm conviction that a mistake has been made.' "[12]

---

[8] The court found that termination of Millie's rights would not be in Emmett's best interests under the circumstances because it would "deny[] him the opportunity to engage in ongoing therapeutic interventions with his mother," which would be "detrimental to his therapeutic progress."

[9] *Joy B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 382 P.3d 1154, 1162 (Alaska 2016) (quoting *Chloe W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 336 P.3d 1258, 1264 (Alaska 2014)).

[10] *Id.* (quoting *Shirley M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 342 P.3d 1233, 1240 (Alaska 2015)).

[11] *Walker E. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 480 P.3d 598, 606 (Alaska 2021) (citing *Eva H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 436 P.3d 1050, 1052 (Alaska 2019)).

[12] *Joy B.*, 382 P.3d at 1162 (alteration in original) (quoting *Chloe W.*, 336 P.3d at 1264).

## IV. DISCUSSION

Before a superior court may terminate parental rights, it must find by clear and convincing evidence that (1) the child is in need of aid; (2) the parent has not remedied within a reasonable time the conduct or conditions that placed the child in need of aid, such that returning the child to the parent would place the child at risk of harm; and (3) OCS has made reasonable efforts toward reuniting the family.[13] The court must also find by a preponderance of evidence that termination is in the best interests of the child.[14]

On appeal, Millie argues that the superior court erred by finding that she failed to remedy within a reasonable time the conduct that placed Ryker and Evan in need of aid. Frank asserts that the court erred by finding that termination of his parental rights was in Evan's best interests. For the reasons explained below, we reject the parents' arguments and affirm the termination of their parental rights.

### A. The Superior Court Did Not Clearly Err By Finding That Millie Failed To Remedy The Conduct Or Conditions That Placed Her Children In Need Of Aid.

In determining whether a parent has failed to remedy conduct or conditions that placed her children in need of aid, the court may consider any fact related to the children's best interests, including:

> (1) the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs;
>
> (2) the amount of effort by the parent to remedy the conduct or the conditions in the home;
>
> (3) the harm caused to the child;

---

[13] AS 47.10.088(a).

[14] *See* AS 47.10.088(c); *see also Bob S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 400 P.3d 99, 109 (Alaska 2017) ("Before terminating parental rights to a child, the superior court must find by a preponderance of the evidence that termination is in the child's best interests." (quoting *Chloe W.*, 336 P.3d at 1270-71)).

(4) the likelihood that the harmful conduct will continue; and

(5) the history of conduct by or conditions created by the parent.[15]

If the court determines a parent has remedied the conduct or conditions placing a child in need of aid, the court must also determine whether the parent has done so within a reasonable time.[16]

The superior court found the children to be in need of aid based on physical abuse, mental injury, and neglect. It also found that Millie had demonstrated "some progress," but that progress was "insufficient to find she has remedied the conduct that caused her children to be in need of aid." Additionally, the court referenced Millie's anger issues and expressed concern about her lack of supervision over the children and her inability to mitigate conflict.

On appeal Millie argues both that she remedied the conduct at issue and that she did so within a reasonable time. Because we hold that the superior court did not clearly err by finding that Millie failed to remedy her conduct, we do not reach Millie's secondary argument that she remedied her conduct within a reasonable time.

Millie asserts she remedied the conduct at issue by following her case plan, which led her to realize her thinking errors and develop skills to change her behavior. From Millie's perspective, her breakthroughs in therapy resulted in her ending her romantic relationship with Frank, taking accountability for the children's exposure to domestic violence, and improving her emotional regulation. She takes issue with two of the findings underlying the court's analysis: first, that she did not take accountability for her role in causing the children to be in need of aid, and second, that she was still in a romantic relationship with Frank.

---

[15] AS 47.10.088(b).

[16] *See* AS 47.10.088(a)(1)(B).

We are not persuaded by Millie's arguments. First, Millie's focus on two of the superior court's findings overlooks the court's other findings related to Millie's conduct and the children's circumstances. Although the court relied on findings that Millie continued to deny any awareness of Frank's abuse and that she continued to have contact with Frank, it also made findings related to many of the factors under AS 47.10.088(b). These factors included the harm caused to the children, the children's ages and needs, the length of time they had been removed from the home, the family's long history with OCS, and Ryker's and Evan's desire to remain with their foster parents.

The superior court described the children's exposure to substantial domestic violence, including the incident when Millie was with Frank and he pointed a gun at Ryker's head.[17] The court discussed the fact that all of the children were now teenagers and that Ryker and Evan had both expressed a preference not to be returned to their parents' care.[18] Further, the court observed Millie and Frank's extensive history with OCS, with this case representing the children's third removal from their care; specifically, the court stated that "unsafe and unsanitary living conditions, a general lack of supervision over the children, physical abuse, exposure to domestic violence, and neglect" were conditions that had persisted for over a decade.[19] And there was ample support in the record for each of these findings.

It is true that Millie substantially completed the requirements of her case plans, and the superior court acknowledged as much. But as we have held on multiple occasions, mere compliance with the steps in a case plan does not preclude a finding

---

[17]     *See* AS 47.10.088(b)(3) ("harm caused to the child").

[18]     *See* AS 47.10.088(b)(1) ("likelihood of returning the child to the parent within a reasonable time based on the child's age or needs").

[19]     *See* AS 47.10.088(b)(5) ("history of conduct by or conditions created by the parent").

that a parent failed to remedy their conduct; the parent must exhibit "an ability to implement the necessary skills to safely care for her children."[20] And the court here found that the evidence weighed against a finding that Millie had sufficiently remedied the conduct at issue. Witnesses and collateral information indicated that Millie had likely not internalized lessons that would ameliorate the safety risk posed to her children.[21] For example, Millie continued to behave inappropriately during visitation with Ryker and Evan and continued to maintain a relationship with Frank until at least mid-2023. Caseworkers expressed particular concern that Millie was simply "jumping through hoops," as she had done with prior removals, but not making actual progress. And perhaps most importantly, despite being confronted with overwhelming evidence, Millie continued to refuse to acknowledge that her children had experienced profound neglect and abuse while in her care. Given the evidence in the record, we are not left with a "definite and firm conviction" that the superior court was mistaken by finding Millie had failed to remedy the conduct or conditions placing her children in need of aid.

Focusing on the two findings Millie specifically identifies, we further observe that the superior court did not clearly err with respect to either finding. The court's finding regarding Millie's failure to take accountability was supported by evidence in the record, as discussed immediately above. Millie asserts her therapist

---

[20] *Charles S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 442 P.3d 780, 792 (Alaska 2019); *see also Rick P. v. State, Off. of Child.'s Servs.*, 109 P.3d 950, 956 (Alaska 2005) (holding father's participation in anger management counseling did not effectively demonstrate his ability to control his anger); *V.S.B. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 45 P.3d 1198, 1208 (Alaska 2002) ("Compliance with treatment plans . . . cannot guarantee that adequate parenting skills will be acquired from the treatment regimen.").

[21] *Barbara P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 234 P.3d 1245, 1260 (Alaska 2010) (finding that by not internalizing teachings from case plan, parent failed to remedy their conduct).

testified "in detail about Millie's breakthroughs in recognizing her failures as a parent." But while the therapist testified that Millie had made some progress in addressing her "thinking errors," the therapist acknowledged that her observations were based solely on Millie's self-reports. The court did not clearly err by declining to give greater weight to the therapist's testimony. We defer to the superior court's determination of how to weigh the conflicting evidence regarding the degree of Millie's therapeutic progress.[22] And contrary to Millie's suggestion, the superior court did not completely disregard testimony from her therapist. Instead, the court found that Millie "appeared to have gained insight into the concerns OCS has identified" but ultimately "continued to deny any knowledge of [Frank]'s abuse as it was occurring."

Millie also argues the court's finding that she was still in a relationship with Frank was not supported by sufficient evidence. Specifically, she maintains that her communications with Frank on limited occasions do not suggest there was romantic entanglement. But the court did not conclude there was a risk to the children only if the parents maintained a "romantic relationship." Instead, the court expressed concern that "the pair are often in contact" and this would suggest Millie "is not being open about her involvement with [Frank]."

These findings are supported by ample evidence, including evidence of the incident where Millie was with Frank when he pointed a gun at Ryker and testimony that Millie and Frank were seen together months after their alleged breakup. There was also evidence of an incident in January 2024, just before trial, where Millie was "pounding" on Frank's door in the middle of the night and called the police for a welfare check, concerned that a "random" woman had taken him somewhere. In connection with this incident, Frank told OCS that Millie kept "texting and calling" him, that he

---

[22]     *Tessa M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 182 P.3d 1110, 1114 (Alaska 2008) (citing *In re Adoption of A.F.M.*, 15 P.3d 258, 262 (Alaska 2001)).

believed she had "anger issues," and that he did not want contact with her. In light of this evidence, the court was not required to credit Millie's statements to her therapist and to OCS that she had ended her relationship with Frank.[23]

Given the ample evidence supporting the superior court's findings, we observe no clear error in its conclusion that Millie failed to remedy the conditions that placed her children in need of aid.

**B.      The Superior Court Did Not Clearly Err By Finding That Termination Of Frank's Parental Rights Was In Evan's Best Interests.**

Before terminating parental rights, the superior court must find by a preponderance of the evidence that termination is in the child's best interests.[24] Frank argues that the superior court erred by finding that termination was in Evan's best interests because it did not specifically address the best interest factors enumerated in AS 47.10.088(b) and because "a child's preference alone does not form the basis of a comprehensive judgment."

Frank's first argument fails based on our precedent. The factors in AS 47.10.088(b) are "intended specifically to guide a court in determining whether a parent has timely remedied conduct or conditions that endanger a child," *not* in determining whether termination is in a child's best interests.[25] Although a court is permitted to consider the factors in AS 47.10.088(b) when making a best interests determination under AS 47.10.088(c), it is not affirmatively required to do so. Instead, a finding that termination is in the best interests of the child "requires a more comprehensive judgment than does determining whether a parent has timely remedied

---

[23]    *See id.*

[24]    AS 47.10.088(c); CINA Rule 18(c)(3).

[25]    *Judith R. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 289 P.3d 896, 901 (Alaska 2012).

dangerous conduct or conditions."[26] Frank's assertion is further undercut by the superior court's findings on several of the AS 47.10.088(b) factors: The court described Frank's history of violence against Millie and the children,[27] discussed the fact that Frank had made no progress on his case plan,[28] and noted Frank's extensive history with OCS.[29] Accordingly, we reject Frank's argument that the court erred by failing to consider the factors under AS 47.10.088(b).

Frank additionally asserts that the superior court's reliance on Evan's preference was error because a child's preference cannot serve as the basis for the "comprehensive judgment" required under AS 47.10.088(c).[30] In essence, this is an argument that the superior court afforded too much weight to Evan's preference in its best interests analysis. This argument also fails. We have previously described the best interests analysis under AS 47.10.088(c) as "capacious,"[31] involving "any fact relating to the best interests," including a child's need for permanency and stability and the

---

**26**    *Id*.; *see also Joy B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 382 P.3d 1154, 1167 (Alaska 2016) ("AS 47.10.088(b) only provides that 'the court *may* consider' any of the enumerated factors; it does not create a duty for the court to do so.").

**27**    *See* AS 47.10.088(b)(3) ("harm caused to the child").

**28**    *See* AS 47.10.088(b)(2) ("effort by the parent to remedy the conduct"); AS 47.10.088(b)(4) ("likelihood that the harmful conduct will continue").

**29**    *See* AS 47.10.088(b)(5) ("history of conduct by or conditions created by the parent").

**30**    *Thea G. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs*., 291 P.3d 957, 966 (Alaska 2013). Frank frames this argument in relation to his assertion that the superior court improperly failed to consider the best interest factors under AS 47.10.088(b). But, as explained above, we reject that argument.

**31**    *Karrie B. ex rel. Reep v. Catherine J.*, 181 P.3d 177, 186 (Alaska 2008).

potential risks of a return to a parent's care, as well as "the bonding that has occurred between the child and [their] foster parents."[32]

We observe no clear error in the superior court's analysis. Frank is correct that the court placed "significant weight" on Evan's preference, but the court stated that it did so "[g]iven the children's ages *and the circumstances presented in this case*." (Emphasis added.) And the court went on to reference several other circumstances in Evan's life:

> [Evan] wants to be adopted by his current placement. [Evan] is fourteen years old. He is thriving in his foster home. He has friends where he is and he feels safe in his home. [Evan] participates in individual and group therapy. He loves to read. He participates in sports and does outside work for his neighbors to earn spending money. He is starting to learn to speak Spanish and gets Bs and Cs. [Evan]'s foster family is eager to adopt him and provide him a permanent stable and loving home.

Given Evan's age and need for stability, his success in foster care, and the circumstances of this case, it was not error for the superior court to give significant weight to his preference. The court heard testimony regarding Frank's severe physical abuse of the children, the family's long history of prior removals, and Frank's lack of any meaningful engagement with his case plan, including a lack of visitation with Evan. Based on these facts, the court found that Frank continued to pose an "on-going safety concern[]" for the children. The superior court conducted a "comprehensive analysis" of Evan's best interests, and we observe no clear error in the court's finding that termination of Frank's parental rights was in Evan's best interests.

---

[32] *Hannah B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 289 P.3d 924, 932-33 (Alaska 2012); *Bob S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 400 P.3d 99, 109 (Alaska 2017) (quoting *Chloe W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 336 P.3d 1258, 1271 (Alaska 2014)).

## V. CONCLUSION

The superior court's order terminating parental rights is AFFIRMED.