# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-22-00156-CV

---

### S. B., J. B., and C. C., Appellants

### v.

### Texas Department of Family and Protective Services, Appellee

---

### FROM THE 33RD DISTRICT COURT OF BLANCO COUNTY
### NO. CV08888, THE HONORABLE J. ALLAN GARRETT, JUDGE PRESIDING

---

## O P I N I O N

Three appellants challenge a final order terminating their respective parental rights to three children. C.C., or "Christine," is the mother of all three children—"Allie," aged 11 years at the rendering of final judgment; "Bailey," aged 4 years; and "Bethany," an infant.[1] J.B., or "Adam," is the father of Allie; S.B., or "Brian," is the father of Bailey and Bethany. The Department removed the children when Bethany's meconium tested positive for marijuana at birth and Christine and Brian both tested positive for methamphetamines. Christine's and Brian's cases were tried together to the bench; Adam's case was tried to jury shortly thereafter. On appeal, Christine challenges the sufficiency of the evidence to support the predicate findings under Texas Family Code § 161.001(b)(1)(D) (endangerment), (E) (knowing exposure of child to circumstances resulting in endangerment), (N) (constructive abandonment), (O) (failure to

---

[1] *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

comply with court-ordered plan), and (P) (use of illicit substance); and the finding that termination is in the children's best interest, *id*. § (b)(2). Adam challenges the sufficiency of the evidence to support predicate findings of (F) (failure to provide support for child) and (P) (use of controlled substance in manner that endangers child); he does not challenge the finding that termination is in Allie's best interest. Brian challenges the sufficiency of the evidence to allow termination of his parental rights to Bailey and Bethany under two subsections of the Indian Child Welfare Act ("ICWA"), 25 U.S.C. § 1912(d) and (f). We will affirm.

**STANDARD OF REVIEW**

Under state law, the trial court may order termination of the parent-child relationship only "if clear and convincing evidence supports that a parent engaged in one or more of the [statutorily] enumerated grounds for termination and that termination is in the best interest of the child." *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam) (citing Tex. Fam. Code § 161.001(b)); *see also A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 697 (Tex. App.—Austin 2019, pet. denied). "Proceedings to terminate the parent-child relationship implicate rights of constitutional magnitude that qualify for heightened judicial protection." *In re A.C.*, 560 S.W.3d 624, 626 (Tex. 2018). Parental rights have been characterized as "essential," "a basic civil right of man," and "far more precious than property rights." *See Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (citing *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)). They are "perhaps the oldest of the fundamental liberty interests" protected by the United States Constitution. *See Troxel v. Granville*, 530 U.S. 57, 65 (2000); *E.E. v. Texas Dep't of Fam. & Protective Servs.*, 598 S.W.3d 389, 396 (Tex. App.—Austin 2020, no pet.). "When the State initiates a parental[-]rights termination proceeding, it seeks not merely to infringe that

2

fundamental liberty interest, but to end it." *Santosky v. Kramer*, 455 U.S. 745, 759 (1982). "Consequently, termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent." *Holick*, 685 S.W.2d at 20. "Because termination of parental rights 'is complete, final, irrevocable and divests for all time' the natural and legal rights between parent and child, a court cannot involuntarily sever that relationship" in absence of "evidence sufficient to 'produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *A.C.*, 560 S.W.3d at 630 (quoting Tex. Fam. Code § 101.007 and *Holick*, 685 S.W.2d at 20). "This heightened proof standard carries the weight and gravity due process requires to protect the fundamental rights at stake." *Id*.

"A correspondingly searching standard of appellate review is an essential procedural adjunct." *Id*. Here, each parent challenges the legal and factual sufficiency to support one or more findings in the trial court's final order. "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *Id*. "Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true." *Id*. at 631. "Factual sufficiency, in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *Id*. "In a factual-sufficiency review, the appellate court must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id*. "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the

3

finding was true." *Id*. Evidence that is factually sufficient to support a trial court's finding necessarily satisfies the legal-sufficiency standard.[2]

Under ICWA, a trial court may terminate parental rights only if termination is permitted by state law, *see S.P. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-17-00698-CV, 2018 WL 1220895, at *2 (Tex. App.—Austin Mar. 9, 2018, no pet.) (mem. op.), and only where the factfinder determines "that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child," 25 U.S.C. § 1912(f). The risk of serious emotional or physical damage must be supported by testimony from "qualified expert witnesses," *id*., and the evidence as a whole must allow the factfinder to conclude the likelihood of that damage "beyond a reasonable doubt," *id*. In addition, the statute requires the petitioner to "satisfy the court that active efforts have been made . . . to prevent the breakup of the Indian family." *Id*. § 1912(d). Because of the increased burden of proof in termination proceedings under ICWA, we must analyze a sufficiency challenge to the ultimate ICWA determination in light of that heightened burden. *See S.P.*, 2018 WL 1220895, at *3. In other words, and as we have explained in the past, we must apply the clear and convincing standard to evaluate a sufficiency challenge to findings rendered pursuant to state law

---

[2] Evidence that is factually sufficient to support a finding is necessarily legally sufficient to do so: in conducting legal-sufficiency analysis, the reviewing court employs a standard more favorable to the disputed finding and examines a subset of the evidence that is less likely to controvert that finding. *See, e.g.*, *K.D. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00116-CV, 2020 WL 4462320, at *4 (Tex. App.—Austin July 15, 2020, pet. denied) (mem. op.) ("Evidence that is factually sufficient to support a trial court's finding necessarily satisfies the legal-sufficiency standard."); *In re A.S.*, No. 02-16-00076-CV, 2016 WL 3364838, at *7 (Tex. App.—Fort Worth June 16, 2016, no pet.) (mem. op.) ("If the evidence is factually sufficient, then it is necessarily legally sufficient as well."); *In re M.V.G.*, 440 S.W.3d 54, 60 (Tex. App.—Waco 2010, no pet.) ("[B]ecause the evidence is factually sufficient, it is necessarily legally sufficient." (citing *In re D.S.A.*, 113 S.W.3d 567, 573 (Tex. App.—Amarillo 2003, no pet.))).

but must ultimately determine—pursuant to ICWA—whether the factfinder could have found beyond all reasonable doubt that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child. *See id.*

## DISCUSSION—CHRISTINE

Christine challenges the sufficiency of the evidence to support predicate findings under Texas Family Code subsections 161.001(b)(1)(D) (endangerment), (E) (knowing exposure to circumstances resulting in endangerment), (N) (constructive abandonment), (O) (failure to comply with court-ordered plan), and (P) (use of illicit substance); and the finding that termination is in the children's best interest, *id.* § (b)(2). Because this analysis will dispose of her appeal, we address only predicate (D) and the best-interest determination. *See In re N.G.*, 577 S.W.3d at 232–33, 237; *A.C.*, 577 S.W.3d at 698–99 & n.2; Tex. R. App. P. 47.1.

### Endangerment

We first address Christine's challenge to the finding of endangerment.[3] "'Endanger' means 'to expose to loss or injury; to jeopardize.'" *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam) (quoting *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531,

---

[3] The Department contends that Christine "concedes and does not challenge the trial court's findings under Tex. Fam. Code §161.001(b)(1)(D), (E), (N), and (O)." Yet Christine expressly phrases her first issue as whether "the evidence was factually and legally insufficient to support the finding that C.C. engaged in the specific conduct set forth in Section 161.001(b)(1) of the Texas Family Code," without limitation as to which predicate she is challenging. Given the unique importance of the constitutional right at stake and the directive from the Supreme Court of Texas that we consider subsection (D) or (E) when presented to this Court, we will consider the sufficiency of the evidence to support the lower court's finding under predicate (D). *See In re N.G.*, 577 S.W.3d 230, 233, 237 (Tex. 2019) (per curiam); *In re A.C.*, 560 S.W.3d 624, 626 (Tex. 2018); *A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 698–99 & n.2 (Tex. App.—Austin 2019, pet. denied). We caution, however, that counselors representing the Department and those appointed to represent parents should take care to abide by the requirements of Texas Rule of Appellate Procedure 38.1.

533 (Tex. 1987)). "Although 'endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *Id*. "Endangerment does not have to be established as an independent proposition, but can be inferred from parental misconduct alone," and courts may look to conduct "before the child's birth and both before and after the child has been removed by the Department." *Pruitt v. Texas Dep't of Fam. & Protective Servs*., No. 03-10-00089-CV, 2010 WL 5463861, at *4 (Tex. App.—Austin Dec. 23, 2010, no pet.) (mem. op.). "Conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being." *Id*. at *14. "Moreover, a parent's mental state may be considered in determining whether a child is endangered if that mental state allows the parent to engage in conduct that jeopardizes the physical or emotional well-being of the child." *In re M.E.-M.N.*, 342 S.W.3d 254, 262 (Tex. App.—Fort Worth 2011, pet. denied). The relevant inquiry under subsection (D) is whether the child's environment, including the child's living conditions and conduct by parents or others in the home, endangered the child's well-being. *V.P. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00531-CV, 2020 WL 544797, at *4 (Tex. App.—Austin Feb. 4, 2020, no pet.) (mem. op.). "Inappropriate, abusive, or unlawful conduct by persons who live in the child's home . . . is part of the 'conditions or surroundings' of the child's home under subsection (D)." *Id*. at *10 (citing *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.)).

Undisputed evidence establishes that both Christine and Brian tested positive for methamphetamines prior to removal and for cocaine metabolites, marijuana, and methamphetamines during the course of these proceedings. According to Christine, this substance abuse in part contributed to interruptions and inconsistencies with Allie's schooling.

6

Bethany's meconium tested positive for marijuana at birth, and the doctors determined Bethany had received virtually no prenatal care. Christine testified that she had not sought medical treatment for her substance abuse or psychological issues because she only wanted providers that respect her spiritual beliefs. At the time of removal, all three girls had lice infestations, with Bailey's infestation so severe that it had resulted in open sores on her head. The girls had not been receiving adequate dental care. According to the pediatric therapist, Allie was exhibiting multiple manifestations of trauma due to her frequent exposure to drug use by Christine and Brian and angry outbursts between the two of them, and Bailey was beginning to withdraw from those around her. The girls' foster mother reported that, at placement, Bailey had just turned four years old but had few of the daily functions one would expect of a child that age. She needed assistance eating and getting dressed and, as the foster mother described it, "was not able to do much for herself." This evidence, taken together, is both legally and factually sufficient to support the trial court's finding of endangerment. *See In re A.B.*, 437 S.W.3d 498, 506 (Tex. 2014) (holding developmental delays due to neglect evidence of endangerment); *In re M.C.*, 917 S.W.2d at 269 ("[N]eglect can be just as dangerous to the well-being of a child as direct physical abuse."); *D.H. v. Texas Dep't of Fam. & Protective Servs.*, -- S.W.3d ---, ---, No. 03-21-00255-CV, 2021 WL 5098308, at *3 (Tex. App.—Austin Nov. 3, 2021, no pet.) (holding substance abuse evidence of endangerment); *In re H.M.O.L.*, No. 01-17-00775-CV, 2018 WL 1659981, at *2, 13 (Tex. App.—Houston [1st Dist.] Apr. 6, 2018, pet. denied) (mem. op.) (holding malnourishment and lack of medical care evidence of endangerment); *In re S.G.F.*, No. 14-16-00716-CV, 2017 WL 924541, at *6 (Tex. App.—Houston [14th Dist.] Mar. 7, 2017, no pet.) (mem. op.) (holding lack of medical care evidence of endangerment); *In re D.E.*, 761 S.W.2d 596, 599 (Tex. App.—Fort Worth 1988, no writ) (holding evidence of "lack of

7

food" and lack of "parental care" evidence of endangerment).  And because only one predicate is necessary to sustain a termination, *In re N.G.*, 577 S.W.3d at 233, we need not reach Christine's challenge to any other predicate.  We overrule Christine's first issue.

**Best Interest**

We next address Christine's challenge to the best-interest finding.  "[T]here is a strong presumption that the best interest of a child is served by keeping the child with a parent." *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006).  "And because of the strong presumption in favor of maintaining the parent-child relationship and the due process implications of terminating a parent's rights to [a] minor child without clear and convincing evidence, 'the best interest standard does not permit termination merely because a child might be better off living elsewhere.'" *In re D.L.W.W.*, 617 S.W.3d 64, 81 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (quoting *In re J.G.S.*, 574 S.W.3d 101, 121–22 (Tex. App.—Houston [1st Dist.] 2019, pet. denied)).  "Moreover, termination is not warranted 'without the most solid and substantial reasons.'"  *Id*. (quoting *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976)).  "In parental-termination proceedings, [the Department's] burden is not simply to prove that a parent should not have custody of [the] child; [the Department] must meet the heightened burden to prove, by clear and convincing evidence, that the parent should no longer have any relationship with the child whatsoever."  *Id*. (citing *In re K.N.J.*, 583 S.W.3d 813, 827 (Tex. App.—San Antonio 2019, no pet.)).

In evaluating best interest, we consider the factors set forth in *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976), which include the child's wishes, the child's emotional and physical needs now and in the future, any emotional or physical danger to the child now and

in the future, the parenting abilities of any parties seeking access to the child, programs available to help those parties, plans for the child, the stability of any proposed placement, any evidence that the parent-child relationship is improper, and any excuses for the parent's conduct. *See A.C.*, 560 S.W.3d at 631; *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012); *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002); *A.S. v. Texas Dep't of Fam. & Protective Servs.*, 394 S.W.3d 703, 714 (Tex. App.— El Paso 2012, no pet.). It is the burden of the party seeking termination to establish that termination is in the child's best interest. *See In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). The set of factors is not exhaustive, and no one factor is necessarily dispositive of the question; but in some instances, evidence of a single factor may suffice to support the best-interest finding. *See Holley*, 544 S.W.2d at 371–72; *In re A.B.*, 269 S.W.3d 120, 126 (Tex. App.—El Paso 2008, no pet.).

We begin with the children's wishes. The factfinder heard testimony that the girls were "excited" to see Christine during visitation, but also heard Allie's reported statement that she wanted to stay with the foster family. Allie further indicated that her sisters felt the same way.

Turning to the children's emotional and physical needs and any emotional or physical risks to the children now and in the future, it is well settled that stability and permanence are paramount considerations in evaluating the needs of a child. *See In re J.D.*, 436 S.W.3d 105, 120 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *Rios v. Texas Dep't of Fam. & Protective Servs.*, No. 03-11-00565-CV, 2012 WL 2989237, at *9 (Tex. App.—Austin July 11, 2012, no pet.) (mem. op.). Far from demonstrating a life of stability, Christine has a long history of living with men who engage in substance abuse and have criminal records. She herself has been abusing substances from a young age, testifying that she and her "birth mother"

9

used to "smoke weed" together. Christine used marijuana through seven months of her pregnancy with Bethany, allegedly unaware that she was pregnant. Her employment and residence were inconsistent throughout the proceedings. Brian's episodes of anger and rage were documented by numerous sources, with those episodes resulting in trauma to both Allie and Bailey. Yet there is no indication from the record that Brian intends to adequately address these issues, and Christine testified that she plans to remain living with him, leaving all three children at risk of continued exposure to substance abuse and conflict.

With respect to the parenting abilities of any parties and evidence of any improper parent-child relationship, Christine has shown an inability to care for herself or her children. At removal, she had failed to provide adequate medical or dental care for the three girls; had not taught Bailey how to function on an age-appropriate level and at one point did not even have Allie—who should have been in fifth or sixth grade at the time—enrolled in school. Nor is there any evidence she was being homeschooled. Christine's acquiescence to Brian's history of anger, criminal activity, and drug use is also indicative of an improper relationship. *See D.F. v. Texas Dep't of Fam. & Protective Servs.*, 393 S.W.3d 821, 836 (Tex. App.—El Paso 2012, no pet.). Meanwhile, the children's current foster parents have raised three children of their own; and have sought out assistance in addressing Allie's and Bailey's educational, psychological, and physical needs. The foster parents are actively working with Allie to overcome her "extreme hyperactivity" and with Bailey to help her overcome her "dissociative" episodes. The older girls are enrolled in the public schools and, according to the foster mom and a case worker, doing "wonderful[ly]."

When it comes to plans for the children, the family therapist testified that Christine and Brian had made very little progress toward establishing plans for themselves or the

10

children and indicated that she had reached the point of wondering "whether it's actually a worthwhile endeavor" to continue waiting for Christine and Brian to come up with those plans. Brian testified that he would find a higher-paying job and work fewer hours to "be there for [Christine], [Allie], [Bailey], and [Bethany]." But Brian offered nothing further on how he planned to accomplish this, and self-serving testimony of such a "speculative" and "hypothetical" nature does not constitute evidence of a concrete plan for the children. *See, e.g.*, *In re A.P.S.*, No. 07-11-00476-CV, 2012 WL 1835688, at *7 (Tex. App.—Amarillo May 21, 2012, no pet.) (mem. op.); *Gonzalez v. Texas Dep't of Fam. & Protective Servs.*, No. 03-06-00004-CV, 2008 WL 2309208, at *6, *9 (Tex. App.—Austin June 5, 2008, no pet.) (mem. op.). The foster family hopes to adopt all three children.

Finally, we consider any excuses for a parent's conduct. While testifying, Christine pointed to her history of childhood abuse, a lack of adequate health insurance, scheduling conflicts, and restrictive spiritual beliefs as interfering with her ability to achieve a stable lifestyle and parent effectively. But even assuming Christine accurately described these circumstances, the factfinder was free to conclude that those limitations did not excuse Christine's chronic instability and poor parenting. *See, e.g.*, *In re H.R.*, 87 S.W.3d 691, 701 (Tex. App.—San Antonio 2002, no pet.) (holding evidence sufficient to sustain rejection of proffered excuses where parent failed to take responsibility for conduct).

After reviewing the record, we conclude the evidence would allow a reasonable factfinder to come to a firm belief or conviction that termination is in the best interest of Allie, Bailey, and Bethany. We therefore reject Christine's sufficiency challenge to that finding.

11

# DISCUSSION—ADAM

Adam challenges the sufficiency of the evidence to support predicate findings under subsections 161.001(a)(b)(F) and (P); he does not challenge the finding that termination is in Allie's best interest under subsection 161.001(b)(2). Because it will dispose of this appeal, we will address only predicate (F).

Subsection (F) permits termination on clear and convincing evidence that a parent "failed to support the child in accordance with the parent's ability during a period of one year ending within six months of the date of the filing of the petition" for termination. *J.G.S.*, 574 S.W.3d at 117 (citing Tex. Fam. Code § 161.001(b)(1)(F)). Under this provision, "one year" means 12 consecutive months. *See In re E.M.E.*, 234 S.W.3d 71, 72 (Tex. App.—El Paso 2007, no pet.). The party seeking termination has the burden to establish that the parent had the ability to support the child financially during each month of the 12-month period. *In re T.B.D.*, 223 S.W.3d 515, 518 (Tex. App.—Amarillo, no pet.). Without evidence of an ability to support a child during the 12-month statutory period, termination of parental rights cannot be granted under subsection (F). *Id*.

On appeal, Adam argues that the "only evidence presented by the Department regarding [his] alleged failure to support [Allie] was testimony that [is] not based on any underlying facts but was merely a slew of conclusory statements." We disagree.

The CASA volunteer testified that Adam has had little contact with Allie in the past and that even when ordered to maintain contact during these proceedings, that contact eventually "drop[ped] off." Allie's psychiatrist corroborated that account, testifying that Allie needed to explore Adam's "lack of contact" with her over the years and the fact that he "was not involved in [Allie's] life.

12

Adam testified that he has received $3,700-3,800 each month for "over 12 years" from the federal government due to disability sustained on a tour of duty in Afghanistan; he also testified that he lives rent-free with his mother. Adam testified that he was not present at Allie's birth and that he did not "contribute anything" to the medical costs associated with that birth. He further testified that he has two other daughters, both of whom live in Germany, but that he has no contact with them and provides them no support. When asked how he supports Christine and Allie financially, Adam responded that he provides "school clothes, Christmas gifts birthday gifts Easter [sic]," and that Christine would occasionally "let [him] know" of any needs, and that he would meet those needs. Adam's mother testified that Adam provides some financial support to Christine and Allie, but that the support is inconsistent such that she cannot estimate the amount. On the stand, Adam conceded that he had only provided a total of $50 or $60 to Christine and Allie over the course of three months.

Before this Court, Adam argues that the jury should have given more weight to Adam's and his mother's testimony of Adam's support of Allie and of his competing financial obligations; but the jury, as the ultimate arbiter of the facts of the case, *see In re J.L.*, 163 S.W.3d 79, 86–87 (Tex. 2005), was free to disregard that testimony in favor of testimony suggesting that Adam had "failed to support the child in accordance with the parent's ability," Tex. Fam. Code § 61.001(b)(1)(F). In addition, Adam argues that the Department failed to provide direct evidence of his ability, if any, to support Allie for 12 consecutive months. But Adam himself provided testimony regarding his income and financial obligations for 12 consecutive *years*; and, regardless, relevant circumstantial evidence regarding Adam's financial means would allow a reasonable juror to draw inferences about Adam's support of Allie during the 12 months set forth by statute. *See Lozano v. Lozano*, 52 S.W.3d 141, 149 (Tex.

13

2001) (Phillips, C.J., concurring in part and dissenting in part) (explaining proper role of circumstantial evidence in family law). Accordingly, the evidence is factually sufficient to support a firm belief or conviction that the Department satisfied its obligation under subsection (F), and because the evidence is factually sufficient, it is also legally sufficient to support that finding. *See supra* note 2. We overrule Adam's first issue on appeal, need not reach his second, and affirm the order of termination with respect to his parental rights.

### DISCUSSION—BRIAN

Brian, a descendant of the Menominee Nation,[4] raises three arguments challenging the legal and factual sufficiency of the evidence to allow termination of his parental rights to Bailey and Bethany under two subsections of ICWA, 25 U.S.C. § 1912(d) and (f). Relying heavily on federal regulatory interpretation of ICWA, Brian argues: (1) that the Department failed to provide a "qualified expert" to testify, *see id.* § 1912(f); (2) that the Department produced insufficient evidence of a "causal relationship between the home conditions and any resulting serious emotional or physical damage" to the children, *see* 25 C.F.R. § 23.121(c)–(d); and (3) that the Department produced insufficient evidence of any efforts to, as he phrases it, "help the parents overcome barriers, make arrangements to provide for family interaction, etc.," *see* 80 Fed. Reg. §§ 10146, 10150 (interpreting 25 U.S.C. § 1912(d)). Because of the heightened burden of proof at trial, it is unclear whether factual-sufficiency review is available in termination cases governed by ICWA.[5] In this case we

---

[4] The nation refers to itself as "The Menominee Tribe of Wisconsin." For convenience, we will refer to this people as the "Menominee Nation."

[5] *See S.P. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-17-00698-CV, 2018 WL 1220895, at *2 n.5 (Tex. App.—Austin Mar. 9, 2018, no pet.) (mem. op.) (outlining

14

will conduct factual-sufficiency review, as that analysis will dispose of both sufficiency questions. *See supra* note 2. Brian has not briefed this Court on the sufficiency of the evidence to support the trial court's findings under section 161.001 of the Family Code, so we need not review those findings. *See* Tex. R. App. P. 38.1(f), (h), (i), 47.1.

**Qualified Expert Witness**

With respect to Brian's arguments regarding the purported absence of a qualified expert witness, we do not find those arguments persuasive. The Department tendered Hilary McKinney, J.D., as its expert witness, and the trial court's final order ultimately included a

---

lack of clarity); *In re K.S.*, 448 S.W.3d 521, 544 (Tex. App.—Tyler 2014, pet. denied) (holding that only legal-sufficiency review is available). Equally unclear are the standards for proving and reviewing ICWA's statutory prerequisites—whether the "qualified expert witness" is in fact qualified, and whether the "active efforts" were adequate. Courts within this state and throughout the nation have diverged as to whether these are questions of law, questions of fact, or discretionary questions handled by the trial court. *See, e.g.*, *Walker E. v. Dep't of Health & Soc. Servs.*, 480 P.3d 598, 606 (Alaska 2021) (holding that whether ICWA expert is qualified and whether efforts were active should be reviewed de novo); *In re Baby Boy Doe*, 902 P.2d 477, 483 (Idaho 1995) (holding that active efforts need not be proven beyond reasonable doubt); *In re Welfare of Child. of J.B.*, 698 N.W.2d 160, 166-67 (Minn. Ct. App. 2005) (noting uncertainty as to whether traditional abuse-of-discretion standard applies to review of ICWA expert's qualifications); *In re Welfare of M.S.S.*, 465 N.W.2d 412, 418 (Minn. Ct. App. 1991) (holding that "active efforts" must be proven beyond reasonable doubt); *People in re A.A.*, 967 N.W.2d 810, 821 (S.D. 2021) (holding that active efforts must be proven beyond reasonable doubt but should be reviewed de novo); *In re D.S.P.*, 480 N.W.2d 234, 237 (Wis. 1992) (holding qualifications of expert witness should be reviewed for abuse of discretion); *In re T.W.*, No. 07-22-00030-CV, 2022 WL 2293919, at *3 (Tex. App.—Amarillo June 24, 2022, no pet.) (mem. op.) ("assuming without deciding" whether expert was qualified); *In re D.E.D.I.*, 568 S.W.3d 261, 264 (Tex. App.—Eastland 2019, no pet. (affirming termination under ICWA after noting that trial court had found active efforts and expert qualifications proven beyond reasonable doubt); *In re G.C.*, No. 10-15-00128-CV, 2015 WL 4855888, at *2 (Tex. App.—Waco Aug. 13, 2015, no pet.) (mem. op.) (holding beyond-reasonable-doubt standard "limited" to ultimate finding regarding risk of damage to subject child); *K.S.*, 448 S.W.3d at 544 (holding that active efforts and expert qualifications must be proven beyond reasonable doubt and should be reviewed under traditional sufficiency standards).

15

finding that McKinney is qualified to serve in that capacity.[6] We generally review a trial court's determination regarding a tendered expert witness for an abuse of discretion. *See Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 718–19 (Tex. 1998).

Although the Act does not define "qualified expert witness," the Bureau of Indian Affairs has promulgated a rule and published additional guidance for use in evaluating the qualifications of such a witness. *See generally* 25 C.F.R. § 23.122; Guidelines for State Courts and Agencies in Indian Child Custody Proceedings, 80 Fed. Reg. 10146 (Feb. 25, 2015) ("supersed[ing]" earlier guidelines and effective immediately). Federal regulatory guidance is not binding on this Court, but Texas courts have consistently consulted the regulations and the guidelines when interpreting ICWA. *See, e.g.*, *S.P.*, 2018 WL 1220895, at *3 (explaining historic reliance and gathering cases).

The pertinent regulation provides a general summary of how the court should identify a qualified expert witness:

> (a) A qualified expert witness must be qualified to testify regarding whether the child's continued custody by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child and should be qualified to testify as to the prevailing social and cultural standards of the Indian child's Tribe. A person may be designated by the Indian child's Tribe as being qualified to testify to the prevailing social and cultural standards of the Indian child's Tribe.
>
> (b) The court or any party may request the assistance of the Indian child's Tribe or the BIA office serving the Indian child's Tribe in locating persons qualified to serve as expert witnesses.
>
> (c) The social worker regularly assigned to the Indian child may not serve as a qualified expert witness in child-custody proceedings concerning the child.

---

[6] The order did not mention McKinney by name, but McKinney was the only witnesses tendered to serve as a qualified expert witness pursuant to ICWA, so we will infer that it was McKinney that the court deemed qualified.

25 C.F.R. § 23.122.

> The guidelines provide more specific criteria:
>
> (a) A qualified expert witness should have specific knowledge of the Indian tribe's culture and customs.
>
> (b) Persons with the following characteristics, in descending order, are presumed to meet the requirements for a qualified expert witness:
>
> > (1) A member of the Indian child's tribe who is recognized by the tribal community as knowledgeable in tribal customs as they pertain to family organization and childrearing practices.
> >
> > (2) A member of another tribe who is recognized to be a qualified expert witness by the Indian child's tribe based on their knowledge of the delivery of child and family services to Indians and the Indian child's tribe.
> >
> > (3) A layperson who is recognized by the Indian child's tribe as having substantial experience in the delivery of child and family services to Indians, and knowledge of prevailing social and cultural standards and childrearing practices within the Indian child's tribe.
> >
> > (4) A professional person having substantial education and experience in the area of his or her specialty who can demonstrate knowledge of the prevailing social and cultural standards and childrearing practices within the Indian child's tribe.

80 Fed. Reg. at 10157.

Here, McKinney was the only witness tendered as a qualified expert witness. When asked to list her qualifications to testify in that capacity; McKinney testified that she is native Choctaw; has an undergraduate degree in anthropology; has a law degree with a certificate in Native American law; handles "primarily" welfare cases involving Native American families; is certified as a "trained, qualified expert witness by the National Indian Child Welfare Association"; is a member of that association; has worked in various capacities for the Cherokee, Chickasaw, Choctaw, Muscogee, and Pawnee nations; and has consulted on or testified in nine

ICWA cases since receiving her certification in 2017.  No one disputes any of this professional experience.  With respect to the Menominee Nation, McKinney began by testifying of her research in preparing for these proceedings.  She then testified as to the Nation's history, population, current location, religious and cultural norms, family expectations, medical practices, and membership regulations.

The specific nature of Brian's challenge to McKinney is unclear from his briefing.  Other than conclusory statements regarding her ostensible lack of qualifications, his brief makes passing references to allegations that McKinney lacks the "requisite trial experience" and "has no experience as a social worker."  But trial experience is not mentioned as a requirement in the statute, regulations, or guidelines; and, moreover, McKinney testified that she had worked on nine cases in just a few years.  Similarly, the statute, regulations, and guidelines do not require the qualified expert witness to be a social worker—and in fact prohibit the children's own social worker from testifying as an expert witness, *see* 25 C.F.R. § 23.122(c).  Moreover, McKinney indicated that she "primarily" works on welfare cases involving Native American families, undermining any suggestion that she has "no experience" with the issues a social worker would encounter in these matters.  Finally, if we construe his brief liberally, Brian appears to argue that McKinney is not sufficiently familiar with the Menominee Nation to offer testimony.  Yet while the guidelines expressly indicate a preference that "a member of the Indian child[ren]'s tribe" serve as expert witness when possible, those guidelines also provide alternatives, including the use of a professional with "substantial education and experience in the area of his or her specialty" and "knowledge of prevailing social and cultural standards and childrearing practices within the Indian child's tribe."  McKinney testified as to her experience in this area of law and of Menominee norms and how those norms compare to norms in the general Native American

18

population; she also testified that it is not uncommon for smaller nations, like the Menominee Nation, to struggle to identify any member willing and able to participate in termination proceedings as a qualified expert witness. On this record, we cannot conclude the trial court abused its discretion in allowing McKinney to testify as the qualified expert witness required by ICWA. *See In re Baby Boy Doe*, 902 P.2d 477, 484 (Idaho 1995) (holding court did not abuse discretion in finding witness "qualified expert" where witness was member of different Nation than subject child but had extensive professional experience in Native American issues and in ICWA cases).[7] We overrule Brian's argument.

**Causal Relationship**

Brian next contends that there is insufficient evidence of the "causal relationship" necessary to allow for termination consistent with ICWA's restrictions. He argues:

> [T]he C.F.R. also requires the evidence at trial to demonstrate a causal relationship between the conditions in the home and the likelihood that the continued custody of the child will result in serious emotional or physical damage to the child. 25 C.F.R. § 23.121(c). In the absence of the causal relationship, evidence only showing poverty, inadequate housing, substance abuse, or nonconforming social behavior does not by itself constitute evidence beyond a reasonable doubt that continued custody is likely to result in serious emotional or physical damage to the child. 25 C.F.R. § 23.121(d).

Subsection 23.121(c) provides, "The evidence must show a causal relationship between the particular conditions in the home and the likelihood that continued custody of the child will result in serious emotional or physical damage to the particular child who is the subject of the child-custody proceeding."

---

[7] Even if we were to conduct this analysis de novo or via traditional sufficiency review, *see supra* note 5, on this record we would overrule the issue.

As we understand it, Brian's position is that there is insufficient evidence of a causal relationship between the statutory predicate findings under state law—including the allegations underlying those findings—and any evidence of likely "damage" to Bailey and Bethany should they remain in his "continued custody." He argues that "[a]t best, the evidence here would show substance abuse and possibly nonconforming social behaviors" without any "evidence of a causal relationship between those complained of actions and serious emotional and physical damage to the children." Brian has pointed us to no case law exploring the meaning of "causal relationship," and our research reveals that few courts have considered the standard. For example, the Supreme Court of Alaska held the standard satisfied where witnesses testified that the children had multiple medical ailments, were not up to date on their vaccines, and were frequently in the presence of physical abuse; the record further revealed that father had not completed his service plan, would continue to engage in substance abuse, had admitted he would be unable to care for the five children, and had presented no evidence suggesting he had changed any of the behavior that led to removal. *Walker E. v. Department of Health & Soc. Servs.*, 480 P.3d 598, 610–11 (Alaska 2021). Similarly, the Supreme Court of South Dakota deemed the standard satisfied where the mother testified that the children were "abused or neglected due to an environment injurious to their welfare" and other evidence suggested that their father had "abdicated his role," "fail[ed] to ensure [the children's] safety," "liv[ed] an unstable, itinerant lifestyle," and failed to take responsibility for his actions, including alleged domestic violence. *People in re A.A.*, 967 N.W.2d 810, 823–24 (S.D. 2021).

When interpretating a regulation, we turn first to its plain language unless another meaning is apparent from the context. *See* Tex. Gov't Code §§ 311.002, .011; *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 438 (Tex. 2011). Black defines "causal" as "[o]f,

20

relating to, or involving causation." *Black's Law Dictionary* (11th 2019). In general, Texas jurisprudence defines "causation" as "cause in fact" with "foreseeability." *See Ryder Integrated Logistics, Inc. v. Fayette County*, 453 S.W.3d 922, 929 (Tex. 2015). Section 23.121(c) is an unusual regulatory provision in that it asks us to consider the causation of a *possible* outcome rather than that of an *actual* outcome. But in a termination case, the factfinder "may infer from a parent's past inability to meet a child's physical and emotional needs an inability or unwillingness to meet a child's needs in the future." *J.D.*, 436 S.W.3d at 118.

In this case, Brian's service provider testified that he suffers from "aggression," "anger issues," and "narcissistic tendencies." She testified that he conceded his history of substance abuse but refused to classify himself as an addict. She testified that he tested positive for methamphetamines and cocaine during the pendency of the case but refused treatment. She further testified that Brian interfered with the case by filing multiple complaints with or against the agency, threatening to "fire" the family therapist, calling a caseworker in the middle of the night on more than one occasion, and physically stalking the foster family. Multiple witnesses testified that Brian is opposed to vaccination of children, which McKinney testified is not consistent with Native American norms. The family therapist testified that Brian had outbursts of anger at nearly every meeting. And, of significant concern, both Brian and Christine testified that they intended to maintain their volatile relationship—a relationship that one therapist characterized as "toxic."

With respect to any causal relationship between these allegations and any immediate risk of "damage" to the girls, Allie's therapist and the family therapist both testified that the household exhibited "lots of conflict," that the children were "very anxious" and showed signs of trauma, that Allie felt an extreme obligation to protect her younger siblings from anger

21

or substance abuse, that Bailey had begun to exhibit dissociative tendencies in which she would disappear into a "hole," and that both of these older girls would show strong emotional reactions at any mention of anger or substance abuse. The family therapist testified that it was not unusual for the children to cry during sessions and that at one point Allie became so upset that she left the room. Given the factfinder's prerogative to infer future conduct from past behavior, *id*., the factfinder here could have deemed it "foreseeable," *Ryder*, 453 S.W.3d at 929, that the conditions in the home and Brian's continued custody would likely result in serious emotional or physical damage to the children. Thus, there is sufficient evidence to support the "causal relationship" required by subsection 23.121(c), and we overrule Brian's argument. [8]

**Active Efforts**

Finally, Brian challenges the sufficiency of the evidence that the Department made adequate efforts "to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family" as required by 25 U.S.C. subsection 1912(d). Again, we disagree. Under ICWA, before parental rights may be terminated, subsection 1912(d) requires "remedial services and rehabilitative programs," including "preventive measures." *Id*. "Any party seeking to effect . . . termination of parental rights to[ ] an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proven unsuccessful." *Id*. The Bureau of Indian Affairs has defined "active efforts" by rule:

---

[8] We would reach the same conclusion regardless of the burden of proof on this element, *see supra* note 5.

Active efforts means affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family. Where an agency is involved in the child-custody proceeding, active efforts must involve assisting the parent or parents or Indian custodian through the steps of a case plan and with accessing or developing the resources necessary to satisfy the case plan. To the maximum extent possible, active efforts should be provided in a manner consistent with the prevailing social and cultural conditions and way of life of the Indian child's Tribe and should be conducted in partnership with the Indian child and the Indian child's parents, extended family members, Indian custodians, and Tribe. Active efforts are to be tailored to the facts and circumstances of the case and may include, for example:

- Conducting a comprehensive assessment of the circumstances of the Indian child's family, with a focus on safe reunification as the most desirable goal;

- Identifying appropriate services and helping the parents to overcome barriers, including actively assisting the parents in obtaining such services;

- Identifying, notifying, and inviting representatives of the Indian child's Tribe to participate in providing support and services to the Indian child's family and in family team meetings, permanency planning, and resolution of placement issues;

- Conducting or causing to be conducted a diligent search for the Indian child's extended family members, and contacting and consulting with extended family members to provide family structure and support for the Indian child and the Indian child's parents;

- Offering and employing all available and culturally appropriate family preservation strategies and facilitating the use of remedial and rehabilitative services provided by the child's Tribe;

- Taking steps to keep siblings together whenever possible;

- Supporting regular visits with parents or Indian custodians in the most natural setting possible as well as trial home visits of the Indian child during any period of removal, consistent with the need to ensure the health, safety, and welfare of the child;

- Identifying community resources including housing, financial, transportation, mental health, substance abuse, and peer support services and actively assisting the Indian child's parents or, when

23

appropriate, the child's family, in utilizing and accessing those resources;

- Monitoring progress and participation in services;

- Considering alternative ways to address the needs of the Indian child's parents and, where appropriate, the family, if the optimum services do not exist or are not available; [and]

- Providing post-reunification services and monitoring.

25 C.F.R. § 23.2. The Bureau has also provided additional guidance, adding several additional considerations to this list and emphasizing that "statutes enacted for the benefit of Indians are to be liberally construed to their benefit." *See* 80 Fed. Reg. at 10150.

Brian's primary argument with respect to this issue appears to be that the evidence "falls far short" by failing to address a sufficient number of the possible elements delineated in the Code of Federal Regulations and the Federal Register. But the Bureau already considered and expressly rejected arguments like these, explaining, "The minimum actions required to meet the 'active efforts' threshold will depend on the unique circumstances of the case." *See* Indian Child Welfare Act Proceedings, 81 *id*. 38,778, 38,791 (June 14, 2016) (responding to comments on 25 C.F.R. § 23.2).

In this case, the record reveals that the Department conducted a comprehensive assessment with family reunification as the original goal, actively assisted Christine and Brian in identifying appropriate providers and obtaining appropriate services, sought out family members that might foster the children, kept all three siblings together, and monitored the progress of Christine, Brian, Allie, Bailey, and Bethany. The Menominee Nation, though aware of the case, reportedly chose not to intervene or otherwise participate in this matter. For her part, McKinney,

as qualified expert witness, testified that she believed the efforts were adequate under ICWA, explaining:

> I do believe the Department has made active efforts. One of those being doing a comprehensive evaluation of the family's needs and determining what kind of services they would need to correct those conditions that led to the children being taken into custody. Another active effort that the Department made was looking into family placements. Doing their diligent search to find family members that may be suitable for the children. Even though that effort failed, that was still an active effort. The other was reaching out to the parent's tribe for assistance in maintaining that sociocultural connection between the children and the tribe. Other than that, I think observing the—the sociocultural norm of connecting with the parents before there was any sort of haircutting, which is a major cultural taboo in a lot of Native American societies, and—and providing [a] language C.D. to the children. I believe that those are all active efforts that were made by the Department. . . . In ICWA[,] we see repeatedly that keeping siblings together is a major part of—of why ICWA was enacted and that that is an active effort that was made.

In resolving this issue, we emphasize that we need not determine whether the efforts described herein would satisfy ICWA's standard in every instance. But in this case, where the qualified expert witness offered detailed testimony as to how the "active efforts" were adequate, where the factfinder heard uncontroverted evidence that Brian actively interfered with a comprehensive plan—verbally assaulting Department staff and service providers and physically stalking the foster family—such that the Department ultimately had to curtail its services, that evidence is sufficient to support the finding that the Department's actions were adequate to satisfy the "active efforts" standard set forth in 25 U.S.C. subsection 1912(d) and related regulatory interpretation. *See id.* (requiring consideration of "unique circumstances"); *In re K.S.*, 448 S.W.3d 521, 544 (Tex. App.—Tyler 2014, pet. denied) (deeming services adequate to satisfy standard where father failed to facilitate successful efforts toward unification).

We overrule Brian's final argument on appeal. [9]

## CONCLUSION

Having overruled the issues and arguments raised by each of the appellants in this matter, we affirm the district court's final order of termination.

_____

Edward Smith, Justice

Before Chief Justice Byrne, Justices Triana and Smith

Affirmed

Filed:   September 15, 2022

---

[9] We would reach the same conclusion regardless of the burden of proof on this element, *see supra* note 5.